**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**JOHN FELT, JR.**

Plaintiff,

v.

Hon.
Mag Judge:
Case No.: 26-

**THE LINCOLN NATIONAL LIFE INSURANCE COMPANY**,
an Indiana corporation,

Defendant.

_______________________________________________________________/

**COMPLAINT**

Plaintiff, JOHN FELT, JR., through his attorneys, ILANA S. WILENKIN and FELDHEIM & WILENKIN, P.C., complains against the above-named Defendant as follows:

## I. Jurisdiction and Venue

1) This Court's jurisdiction exists under the Employee Retirement Income Security Act of 1974 ("ERISA"), specifically, 29 U.S.C. §§ 1132(e)(1) and 1132(f), which provisions grant this Court the jurisdiction to hear civil actions to recover benefits due under the terms of an employee welfare benefit plan.

2) The subject of the instant litigation centers on Defendant's denial of Plaintiff's total disability waiver of life insurance premium pursuant to the GFL Environmental - GFL SE Active's Health and Welfare Benefit Plan ("the Plan"). GFL Environmental - GFL SE Active ("GFL") employed Plaintiff ("Mr. Felt") as well as sponsored and administered the Plan.

3) Defendant, The Lincoln National Life Insurance Company ("LF"), underwrites the coverage(s) and acts as the Plan's claims' administrator.

4) 29 U.S.C. § 1133 provides a mechanism for the administrative or internal appeal of benefit denials. Mr. Felt has either exhausted all his appeals or has been denied access to a meaningful and/or full and fair pre-suit appellate review. This matter is ripe for juridical review.

5) Pursuant to 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391, venue is proper in the Eastern District of Michigan.

## II. <u>Nature of Action</u>

6) This is a claim seeking a total disability waiver of life insurance premium pursuant to the Plan that covers GFL employees, including Mr.

Felt. This action is brought pursuant to § 502(a)(1)(B) of ERISA - 29 U.S.C. § 1132(a)(1)(B).

## III. The Parties

7) Mr. Felt is 54 years old. He was, and continues to remain, a resident of Sterling Heights, Michigan.

8) LF is an Indiana corporation conducting insurance-related business in Michigan, including the Eastern District. Its Resident Agent for service of process is CSC-Lawyers Incorporating Service (Company) 3410 Belle Chase Way, Suite 600, Lansing, MI 48911.

9) During all relevant times, the Plan constituted an "employee welfare benefit plan," as defined by 29 U.S.C. § 1002(1), and, incidental to his employment with GFL, Mr. Felt received coverage under the Plan as a "participant," as defined by 29 U.S.C. § 1002(7). This claim relates to benefits due under the above-described Plan.

## IV. Factual Statement & Medical Support

10) Mr. Felt is 54 years old. He began working for GFL during May 2012 as a Driver and during October 2018 was promoted to Supervisor.

11) Mr. Felt stopped working in any capacity on or about 7/19/22 due to significant cardiac disease as well as other serious health issues.

12) Shortly after his last day of work, Mr. Felt applied to LF to begin receiving short-term disability benefits, which claim LF approved and paid beginning roughly 7/28/22 through 10/17/22.

13) LF next approved and paid Mr. Felt own occupation long-term disability ("LTD") benefits beginning approximately 10/18/22 through 6/11/24. LF denied Mr. Felt's LTD and total disability waiver of life insurance premium ("WOLP") claims effective 6/11/24, at which point there were four months of own occupation benefits still due and owing.

14) Mr. Felt appealed both the LTD and WOLP denials on 11/25/24.

15) On 12/11/24, LF notified the Undersigned that it had received Mr. Felt's appeal(s).

16) On 1/30/25, LF provided the Undersigned for review and comment two medical reports and a Transferrable Skills Analysis that it had obtained as part of its appeal review:

**<u>1/10/25 - Tanisha Taylor, M.D. (occupational medicine):</u>**

Taking into consideration the entire clinical picture, from 6/11/2024 forward, restrictions and limitations are supported due to coronary artery disease, chronic stable angina, and a reduced left ventricular ejection fraction with impaired diastolic relaxation. The cardiology note from Justin Trivax, MD, on 8/21/2024, noted a follow-up for atherosclerotic heart disease. In this office visit as well as the prior visits, the claimant indicated there has been ongoing angina. However, he does not complain of shortness of breath, palpitations, or edema. The claimant has nine coronary stents. Dr. Trivax diagnosed chronic stable angina in the setting of atherosclerotic coronary artery disease with a reduced left ventricular ejection fraction of 45-50% (noted on 1/2024 echocardiogram). The claimant is being treated with aggressive medical management and uses nitroglycerin when he gets chest pain. Other cardiac medications include isosorbide, metoprolol, and ranolazine; as well as antiplatelet agents such as plasugrel and aspirin to reduce the risk of plaque rupture in the arteries.

I defer the conditions of cervical and lumbar degenerative disc disease as well as neuropathy, right knee pain, GERD, and Anxiety to appropriate specialists.

Given the claimant's coronary disease and reduced left ventricular function, the following R/Ls are supported from 6/11/2024 forward on a full-time basis: Sitting, standing, walking frequently each. Lifting, carrying, pushing, pulling up to 20 lbs. occasionally. Stooping, kneeling, crouching occasionally. Reaching at waist/desk level constantly. Reaching overhead and below waist level occasionally. Handling and keyboarding constantly. Use of lower extremities for foot control occasionally. No climbing ladders; no balancing, working at heights, or crawling.

Reassessment of R/Ls is recommended in six months from the date of this review, with updated notes from the PCP and cardiologist.
No additional activity restrictions are supported. (Claim File).

**<u>1/23/25 – Lara Edinger, D.O. (neurology):</u>**

The claimant demonstrates **significant neurological impairments, supported by clinical findings, imaging studies, and electrodiagnostic evidence. Severe sensorimotor polyneuropathy with axonal features, as confirmed by electrodiagnostic studies, contributes to profound sensory and motor deficits in the lower extremities, leading to weakness, instability, and impaired mobility. Lumbar spinal stenosis, evidenced by MRI findings of significant foraminal narrowing at L4-L5 and L5-S1, correlates with chronic back pain and right lower extremity radiculopathy. Despite some improvement following physical therapy and interventions such as sacroiliac joint injections, the claimant continues to experience pain and functional limitations, which impair activities**.

Clinical evaluations further document right leg instability and weakness, likely secondary to the combination of lumbar spinal stenosis and polyneuropathy. **These deficits compromise the claimant's ability to ambulate safely** or perform physical tasks requiring substantial strength and coordination. Imaging studies also reveal multilevel degenerative disc disease in the cervical and lumbar spine and degenerative changes in the knee, which compound the claimant's pain and mobility restrictions**. The chronicity of these symptoms, despite consistent treatment efforts, underscores the persistence and severity of the neurological impairments**. Taken together, these factors establish a clear basis for the claimant's neurological impairment**, significantly affecting functional capacity and quality of life**.

Appropriate restrictions and limitations are as follows:

- Lifting, carrying, pushing, and pulling for up to I0 pounds occasionally and 5 pounds frequently

- Standing I0 minutes at a time for up to 2.5 hours per day

- Walking 10 minutes at a time for up to 2.5 hours per day

- Sitting with the ability to change positions briefly as needed for comfort

- No walking over slippery surfaces

- No climbing ladders or working at heights

- Occasionally climbing stairs

- Occasionally stooping, bending, and twisting

- No restrictions with reaching in any direction

No additional activity restrictions are supported. Re-assessment within 6 months from the date of this report would be reasonable as **these conditions are chronic in nature**.

While the claimant has documented neurological and musculoskeletal impairments, there is a difference of opinion regarding the extent to which these impairments preclude sedentary work. The treating provider, Daniel Braschayko, NP, noted that the claimant was deemed "’unsafe to return to work’" and highlighted difficulty with sitting and standing for prolonged periods.

However, several aspects of the documentation do not substantiate a complete inability to function at a sedentary

level. Electrodiagnostic studies performed on 08/14/24 showed severe sensorimotor polyneuropathy but no evidence of lumbar radiculopathy. This finding suggests that while peripheral nerve involvement is significant, there are no substance [?] reports of neurological deficit on exams and no evidence of measurable motor testing or sensory deficit during the time frame in question.

Additionally, MRI findings of the lumbar spine, while showing foraminal narrowing at L4-L5 and L5-S1, do not indicate high-grade spinal canal narrowing or definitive evidence of nerve root compression that might fully explain the reported severity of symptoms. Furthermore, the claimant demonstrated improvement in pain frequency, duration, and intensity during physical therapy as of 07/09/24, suggesting some capacity for recovery and adaptation. (Claim File). (emphasis added).

**<u>1/29/25 TSA – Jason M.:</u>**

I have been asked to base this review on the claimant's restrictions and limitations per a peer review completed by Lara Edinger DO (Neurology) on 01/23/25 . . .

**<u>SUMMARY:</u>**
This Transferable Skills Analysis identified occupations within the Insured's physical abilities and identified skill level.

Examples of occupations identified based on the national economy labor market and the Insured's ability profile analysis include:

| <u>DOT Code</u> | <u>Occupation Title</u> | <u>Strength Level</u> | <u>Monthly Wage</u>[1] |
|---|---|---|---|
| 249.137-026 | Supervisor, Order Takers | Sedentary | $5,287 |
| 221.367-066 | Scheduler, Maintenance | Sedentary | $4,491 |

(Claim File).

17) On 2/1/25, Mr. Felt participated in a Functional Capacity Evaluation, which concluded as follows:

> **Client/Occupation Physical Demand Category**
> Mr. Felt is unable to work full time. The unskilled sedentary occupational base is significantly eroded because he is unable to lift floor to waist 10 lbs or slightly less, shoulder lift 10 lbs or slightly less, power lift 10 lbs or slightly less, bilateral carry 10 lbs or slightly less, walk occasionally, stand for 1 hour and 45 minutes, sit for approximately 6 hours of an 8-hour workday, and sit at least 2 hours at one time.
>
> **Consistency of Effort**
> During objective functional testing, Mr. Felt demonstrated consistent effort throughout 90.5% of this test which would suggest Mr. Felt put forth full and consistent biomechanical and evidence based effort during this evaluation.
>
> **Reliability of Pain Ratings**
> Throughout objective functional testing, Mr. Felt reported reliable pain ratings 84.0% of the time which would suggest that pain could have been considered a limiting factor during functional testing.
>
> **Therapy Recommendations**
> I would recommend continued cardiac rehab and physical therapy for his neck/back/knee pain management to help him maintain/prevent further loss of function.
>
> **Summary / Impression**
> Mr. Felt is not a candidate for even sedentary work based on his unstable cardiac history and, the severity of his back, neck, and knee conditions. Review the findings of this functional capacity evaluation.

**Assessment Purpose / Reason for Referral**
The purpose of this Baseline Functional Capacity Evaluation is to determine Mr. Felt's overall musculoskeletal and functional abilities as it relates to the physical demands outlined by the United States Department of Labor in the Dictionary of Occupational Titles.

**Limiting Factors Noted During Testing**
During this evaluation, Mr. Felt presented with limiting factor(s) during objective functional testing which included: Increased Pain, Mechanical Changes, Mechanical Deficits, Inadequate Strength, Safety Concern, General Fatigue, Limited Range of Motion and Loss of Balance. (Claim File).

18) Mr. Felt also provided LF with updated cervical, lumbar, and right knee MRIs as follows:

1/24/25 cervical MRI:

1. Stable cervical spine MRI from 11/20/23.

2. Central disc herniation at C3-4 abutting the cord, stable.

3. Multilevel moderate to severe foraminal stenosis particularly at the left C6-7 right C3-4 and bilateral C4-5 levels as discussed [in the body of the report.] (Claim File).

1/21/25 lumbar MRI (compared to 11/28/23):

IMPRESSION:

1. At L3-4 significant progression of a broad-based foraminal and extraforaminal right disc bulge with significant mass effect on the lateral recess and especially the exiting L3 nerve root.

2. At L4-5, worsening severe left foraminal narrowing from broad-based foraminal/extraforaminal disc bulge.

T11-12: Mild disc bulging. Facet arthropathy.

T12-L1: T12-L1 Facet arthropathy.

L1-2: Facet arthropathy and minimal disc bulging. Minimal central canal stenosis is stable.

L2-3: Facet arthropathy and broad-based disc bulge. Mild bilateral foraminal narrowing, left greater than right. Mild central canal stenosis. No change.

L3-4: Facet arthropathy. Broad-based disc osteophyte complex. Severe right foraminal narrowing has worsened when compared to the prior study. Significant mass effect on the exiting L3 nerve root is appreciated. Moderate left foraminal narrowing is stable. Mild central canal stenosis. (On the prior report, this was described at the L4-5 level.)

L4-5: Facet arthropathy. Broad-based disc osteophyte complex. Stable mild right foraminal narrowing. Worsening severe left foraminal narrowing. (On the prior report, this was described as the L5-S1 level.)

L5-S1: Rudimentary disc. (Claim File).

1/24/25 right knee MRI (compared to 7/24/24)

1. Intact menisci, cruciate and collateral ligaments.

2. Localized region of deep chondral fissuring along the lateral tibial plateau posteriorly with mild subchondral bone marrow edema, largely similar compared with 7/24/2024.

3. Borderline small knee joint effusion. (Claim File).

19) LF provided the 2/1/25 FCE and 1/24/25 imaging reports to Dr. Edinger and Jason M. for further review.

20) On 3/11/25, Dr. Edinger offered the following opinions:

**Summary:**
This is an addendum review.

An MRI was provided indicating that the claimant had a stable cervical MRI from the prior exam. Central disc herniation C3 - C4 abutting the cord which is stable. Multilevel moderate to severe foraminal stenosis particularly on the left C6 - C7, right C3 -C4 and bilateral C4 C5 levels . . .

Upon reviewing the additional medical documentation, the findings indicate ongoing impairments related to lumbar spinal stenosis, right lower extremity radiculopathy, severe polyneuropathy, and right knee instability. The claimant continues to report significant pain, weakness, and functional limitations, which remain consistent with prior medical assessments. Electrodiagnostic studies confirm severe sensorimotor polyneuropathy but do not indicate lumbar radiculopathy. Additionally, the claimant's cardiac history, including coronary artery disease and continued nitroglycerin use, may contribute to reduced endurance. While physical therapy has resulted in some improvement, functional deficits persist . . .

The FCE findings align with the claimant's documented impairments, particularly severe polyneuropathy, lumbar stenosis, and right knee instability, which are well-supported by medical evidence. The reduction in lifting and carrying capacity (5 pounds bilaterally, 3 pounds for shoulder lifting) is consistent with clinical findings of polyneuropathy, which can cause muscle weakness, loss of coordination, and diminished strength. **Additionally, the FCE's determination that the claimant is unable to work full-time aligns with the documented reports of persistent pain, weakness, and functional decline**. The standing tolerance findings (15 minutes at a time, 1 hour and 8 minutes total) are generally in line with prior medical assessments, which suggested standing should be limited to 10 minutes at a time and up to 2.5 hours per day.

However, inconsistencies exist regarding the claimant's sitting tolerance. The FCE states that the claimant was able to sit for 2 hours and 38 minutes before needing a positional change, yet also notes that he required a change in position every 9 minutes. These findings contradict each other, as needing frequent adjustments suggests greater positional intolerance than the total duration implies. **Given the documented lumbar stenosis, foraminal narrowing, and polyneuropathy, prolonged sitting is likely more limited than the FCE suggests**. Similarly, while the standing endurance findings are generally in line with prior assessments, they appear less restrictive than expected given the claimant's documented right leg instability, ongoing pain, and worsening symptoms, **suggesting standing may be more limited than reported in the FCE**.

Updated Reasonable Restrictions

While the FCE provides useful clinical data, it is essential to integrate all clinical evidence, including medical history, self-reported symptoms, demonstrated activities, and diagnostic findings, to ensure an accurate functional assessment.

Based on both the FCE findings and the medical documentation, reasonable restrictions from 06/11/2024, forward, would include:

> **Lifting, carrying, pushing, and pulling limited to 5 pounds occasionally and less than 5 pounds frequently**.
>
> Sitting limited to approximately 30 minutes at a time, up to a total of 6 hours per day, **with the ability to change positions as needed due to positional intolerance rather than unrestricted sitting**.
>
> Standing limited to 10 minutes at a time, up to a total of 2 hours per day due to lower extremity instability and polyneuropathy.
>
> Walking limited to short distances, with a maximum of 10 minutes at a time, up to a total of 2 hours per day . . .
>
> Frequent opportunities to change position throughout the workday (i.e., ability to alternate between sitting, standing, and walking at will).

Conclusion

The FCE findings support greater functional limitations than the prior assessment, particularly in lifting, carrying, and overall work capacity. While many of the FCE findings are consistent with the clinical documentation, **discrepancies in sitting tolerance and standing endurance suggest that the claimant's ability to maintain prolonged static positions is more limited than the FCE reports indicate**. Given the chronic nature of these conditions, reassessment within six months remains appropriate to monitor any progression or stabilization of function. The updated restrictions reflect the claimant's documented impairments while accounting for the functional capacity demonstrated during testing.

(Claim File). (emphasis added).

21) On 3/18/25, Jason M. prepared an updated Vocational Assessment based on Dr. Edinger's 3/11/25 addendum: "Based on these updated capacities, the previously-identified occupations remain viable. All occupations were verified manually and individually against restrictions and limitations above. This information will be provided to the ARC. This memorandum will serve in lieu of a formal written report given no change from the prior review." (Claim File).

22) On 3/27/25, LF approved the balance of own-occupation LTD benefits through 10/18/24 (6/11/24 through 10/18/24). It denied any-occupation benefits beginning 10/19/24 because "the review on appeal does not support your client meets the policy provision of Total Disability from performing in any occupation." (Claim File).

23) LF allowed Mr. Felt until 4/10/25 to respond to its medical and vocational reviews.

24) On 4/3/25, Mr. Felt emailed LF Dr. Trivax's (cardiologist) 12/11/24 report and 2/17/25 treatment note.

25) On 4/4/25, LF denied Mr. Felt's waiver of life premium claim: "We have completed our review of your client's appeal for Extension of

Death Benefit, also known as Life Waiver of Premium under the above referenced policy. Based on the information provided, we have determined that we are unable to approve benefits beyond 06/12/2024." (Claim File).

26) On 4/14/25, LF denied Mr. Felt's LTD claim: "Based on the information provided, we have determined that we are unable to approve benefits beyond 10/18/2024." (Claim File).

27) On 9/29/25, Mr. Felt again appealed LF's adverse LTD and WOLP decisions.

28) As part of Mr. Felt's appeal, he submitted as Exhibit 8, Bobbi Goodwine, PT, DPT, OMPT, CLT's response to Dr. Edinger's 3/11/25 addendum:

> I would like to address the noted concern regarding the perceived inconsistency in sitting tolerance.
>
> Regarding the comment about inconsistencies, I believe there may have been a misinterpretation due to the confusing wording generated by the FCE reporting software. The report does not state that the claimant was able to sit continuously for 2 hours and 38 minutes. Rather, it indicates that the total cumulative sitting time during the evaluation was 2 hours and 38 minutes, and that he required a change in position after 15 minutes (this was the longest he was able to go without changing position), with the average sitting tolerance (before changing position) being approximately every 9 minutes. This

is not contradictory but rather illustrates the need for frequent positional changes throughout the sitting duration. (Claim File).

29) Exhibit 9 of Mr. Felt's 9/29/25 appeal was a 9/8/25 vocational report authored by Elizabeth Pasikowski, MRC CRC LPC who opined as follows:

> **EDUCATIONAL BACKGROUND:**
> Southwestern High School, 11th grade
> General Education Diploma . . .
>
> All of Mr. Felt's past work is considered to be semi-skilled and ranged from the medium level of exertion to the very heavy level of exertion . . .
>
> **DEFINITION OF DISABILITY:**
>
> Lincoln National Life Insurance Company's policy indicates the following:
>
> **TOTAL DISABILITY or TOTALLY DISABLED** will be defined as follows:
>
> 1. During the Elimination Period and Own Occupation Period, it means that due to an Injury or Sickness the Insured Employee is unable to perform each of the Main Duties of his or her Own Occupation.
>
> 2. After the Own Occupation Period, it means that due to an Injury or Sickness the Insured Employee is unable to perform each of the Main Duties of any [gainful] occupation which his or her training, education or experience will reasonably allow.

**GAINFUL OCCUPATION** means any occupation in which the Insured Employee:

1. is or could reasonably become qualified, considering his or her education, training, experience, mental and physical abilities;

2. could reasonably find employment, considering the demand in the national labor force; and

3. could earn (or reasonably expect to earn) a before-tax income at least equal to 60% of his or her Predisability Income, within 12 months of returning to work . . .

**OPINION:**

Jason M. did not identify the appropriate job title for Mr. Felt's job at GFL and therefore the job analysis is inappropriate. He did not apply the results of the Functional Capacity Evaluation. He only utilized a Lincoln Financial medical reviewer's opinions for determining function.

The functional capacity evaluation determines capability to perform work on a daily, regular basis. The test identified the following:

95% consistent effort
85% reliable pain test

If Mr. Felt cannot maintain full-time work, then minimally Mr. Felt is only available for part-time work and therefore would not meet the disability standard and is unable to earn wages consistent with the benchmarks as set forth by Lincoln Financial. (Claim File).

30) Exhibit 10 of Mr. Felt's 9/29/25 appeal consisted of another narrative report authored by Mr. Felt's primary care provider, Daniel Braschayko, MSN, FNP-C:

> I am providing an updated letter from the one that was given on 10/28/24 outlining Mr. John Felts care. His medical conditions are complicated, and he has many comorbidities that affect his ability to work. He routinely sees his cardiologist Dr. Trivax and last saw on 8/25/25. I saw Mr. Felt last on 9/12/25. I follow him for his lumbar spinal stenosis and severe right neural foraminal stenosis L3-L5, MDD, insomnia, and any acute care needs he can receive from his primary care team. He must take nitroglycerine weekly. When I saw him last, he stated he had to take a dose two days ago while he was attempting to cut his grass. If he takes a walk around the block, he needs to take nitro. Normal outdoor tasks that may take you or I 15-30 minutes to complete take him 4-5 hours. After any exertion longer than 10-15 minutes he needs to rest. Having to stop and rest/take nitro on a regular basis would make any type of work difficult. Him not being able to work is not his choice. He physically cannot work without jeopardizing his health. He has always been good with all his appointments, follow-ups, and referrals. This year he has been seeing Dr. Elia for lumbar radiculopathy and cervical disc disorder with radiculopathy. Dr. Elia is recommending surgery, however, due to his extensive cardiac history, he is not candidate to go under anesthesia/go through with this procedure. He has gone through physical therapy. He has been seeing a chiropractor. He is doing everything he needs to do to try and improve his health. It is not because he doesn't try. This is something that I know frustrates him. He doesn't want to be disabled, he wants to be able to work, but unfortunately his health does not allow this. Please consider putting yourself in his shoes.
> Would you want to be spending all your free time going to

> appointments, procedures, follow ups without any relief of his burdensome health conditions?
>
> I have seen Mr. Felt four times this year and even more time spent talking with him on the phone. He is frustrated. Frustrated that he has a bad heart, frustrated that at any given moment he can have a heart attack. Frustrated that his body is breaking down. His lumbar and cervical spine are causing him severe pain. He is frustrated that he cannot get a decent night's rest because of his medical condition.
>
> I have seen people with a lot fewer and less severe medical issues that end up getting 100% disability. At this point, I am unsure what the reviewers who do not know him and have never treated him are seeing than the medical professionals who actually are involved in his care and help make medical decisions for him. (Claim File).

31) Mr. Felt also submitted with his 9/29/25 appeal as Exhibit 11 the physical demands required for sedentary work,

32) On 11/13/25 and 11/14/25, LF advised the Undersigned that: "We have reviewed all of the information submitted, and after further analysis of your client's claim, we have determined that Long Term Disability benefits are appropriate." (Claim File).

33) On 11/13/25, LF advised that Mr. Felt's WOLP claim was likely going to be denied but allowed him until 12/4/25 to respond to the additional information that it had generated, which included the following:

34) A 10/17/25 Nursing Memo indicated:

> The employee initially separated from work on July 20, 2022 with cardiac disease. The employee has subsequently been diagnosed with lumbar stenosis and cervical radiculopathy. The employee is treated by multiple specialist that include cardiology, Neurosurgery, and Family Medicine. Current records indicate that the employee may undergo surgery for lumbar stenosis but this is not clarified in the current records. Employee is reported to be disabled primarily due to cardiac conditions per Nurse Practitioner Braschayko. Given the complexity of the claim with numerous medical conditions, complaints by employee and support for impairment by treating provider; the recommendation is referral for a peer review by Internal Medicine MD to assess totality of conditions and ability of employee to perform on a sustained and consistent basis from October 18, 2024 and forward. (Claim File).

35) On 10/30/25, Rani Hanna, M.D. (internal medicine) conducted a peer review and offered the following opinions:

> The weight of the submitted medical documentation supports restrictions and limitations. Objective evidence substantiating this opinion includes his **severe** Coronary Artery Disease with a history of numerous percutaneous coronary interventions and persistent angina pectoris that occurs with minimal exertion and emotional stress, despite optimal medical therapy 8/16/24, 11/12/24, 2/17/25, 12/11/24. His cardiologist noted his struggles are due to CAD and cardiomyopathy and that he is unable to perform his current occupation with these limitations 12/11/24. **Functionally, he is also severely impaired** by Lumbago with Sciatica secondary to Lumbar and Cervical Stenosis, and a Severe Sensorimotor Polyneuropathy. Imaging confirms significant progression of a right L3-4 disc bulge with mass effect on the L3 nerve root and worsening severe left L4-5 foraminal narrowing (1/21/25), alongside multilevel moderate to severe cervical foraminal stenosis on

> 1/24/25. Clinically, this correlates with decreased lower extremity muscle strength, an abnormal gait, a positive SLR on the right, and ataxic tandem gait (5/28/25, 6/13/25).
>
> Physical therapy documented severe impairment, with an Oswestry Low Back Disability Index score of 68-74% and Neck Disability Index scores of 58-62% (7/9/24, 2/1/25, 5/28/25, 7/2/25). These findings justify significant limitations in all postures and activities that involve physical exertion, repetitive motion, or prolonged standing/walking, particularly due to the risk of exacerbating both his cardiac and chronic pain conditions. **Therefore, a Sedentary to Light exertional level of work is warranted, with specific postural and manipulative limitations**. (Claim File). (emphasis added).

36) Dr. Hanna misrepresented the reason for Mr. Felt's 2/1/25 physical therapy encounter by indicating that: "02/01/2025, Bobbi Goodwine, PT, DPT / Physical Therapist: **The claimant presents for a PT initial exam**. His PT diagnosis was cervicalgia, lumbago with sciatica, pain in the knee, and unstable angina. His NDI score was 62% and his modified Oswestry low back disability index score was 74% disability." (Claim File). (emphasis added).

37) Dr. Hanna failed to reference the 2/1/25 Functional Capacity Evaluation's findings.

38) On 11/5/25, LF, through Megan P. MA, CRC, conducted another Transferrable Skills Analysis in which she concluded:

**<u>The following documentation was reviewed:</u>**

- Job Description dated 10/19/2022
- Dictionary of Occupational Titles (DOT)
- Economic Research Institute (ERI)
- Occupational Requirements Survey (ORS)
- OA completed by Jennifer B., VRC, dated 2/22/2023
  TSA and Addendum completed by Jason M., VRC, dated 1/29/2025 & 3/18/2025
- Training, Education, and Experience form, dated 2/21/2024
- Peer Review from Dr. Rani Hanna, MD, dated 10/30/2025 . . .

Examples of Occupations identified based on national economy labor market and insured's ability profile analysis:

237.367-022 Information Clerk [Sedentary]
379.367-010 Surveillance-System Monitor [Sedentary]

(Claim File).

39) Megan P. failed to consider the 2/1/25 FCE findings.

40) Megan P. failed to consider Elizabeth Pasikowski's 9/8/25 vocational report.

41) Megan P. failed to consider the opinions of ANY of Mr. Felt's providers.

42) The LF Voluntary Life Policy defines Total Disability to mean:

DEFINITION OF TOTAL DISABILITY. For this benefit, Total Disability:

(1) means you are unable, due to sickness or injury, to perform the material and substantial duties of

any employment or occupation for which you are or become qualified by reason of education, training, or experience; and

(2) must continue for at least 180 days. (Claim File).

423 The LF Group Life Policy defines Total Disability to mean:

Life insurance will be continued, without payment of premiums, for an Insured Person who:

(1) becomes Totally Disabled while insured under this policy and before reaching age 60;

(2) remains Totally Disabled for at least 6 months in a row; and

(3) submits satisfactory proof within the 7th through the 12th months of disability . . .

DEFINITION. For this benefit, Total Disability or Totally Disabled means an Insured Person:

(1) is unable, due to sickness or injury, to engage in any employment or occupation for which such Insured Person is or becomes qualified by reason of education, training, or experience; and

(2) is not engaging in any gainful employment or occupation. (Claim File).

44) On 12/2/25, Ms. Pasikowski prepared a rebuttal to LF's putative WOLP denials as follows:

I was provided the three policies and distinct definitions as pertaining to the three policies that Mr. Felt owns.

Each of the policies discusses inability due to sickness or injury and is

(1) LTD
unable to perform each of the Main Duties of any Gainful Occupation.

(2) Voluntary Life Policy
perform the material and substantial duties of any employment or occupation for which you are or become qualified by reason of education, training, or experience; and must continue for at least 180 days.

(3) Basic Life Policy
to engage in any employment or occupation for which such Insured Person is or becomes qualified by reason of education, training, or experience

**When reviewing the language, there is no substantive distinction in the terms as applied to disability and if Mr. Felt is found disabled based on his education, training, experience and medical record for one policy, then the application of the remaining policies should all correspond and deem Mr. Felt totally disabled**. (Claim File).

45) On 12/15/25, LF denied Mr. Felt's WOLP claims as follows:

Based on the information provided, we have determined that we are unable to approve benefits beyond 06/12/2024 . . .

Life Waiver of Premium were approved from 07/19/2022 to 06/12/2024. Benefits were not approved beyond 06/12/2024 after a review of the medical documentation failed to support Total Disability as defined above. Our evaluation included review of the medical documentation, **including consultation with and/or review of a written report from an independent physician who is Board Certified in Cardiology** . . .

> The definitions of Total Disability under the Life and Voluntary Life policies, as noted above, do not include gainful wording. Your client's LTD benefits were approved because the vocational review of the LTD file did not identify gainful occupations your client could perform based on your client's education, training, experience and within your client's identified restrictions and limitations . . .
>
> The available clinical documentation does not contain evidence of physical or functional impairment that would preclude your client from working at any occupation. The reviews of your client's medical records did not identify restrictions and limitations that would prevent your client from performing any occupation. (Claim File).

46) LF did not provide the Undersigned with a copy of the report or any communications by and between it and the board-certified cardiologist with whom it consulted.

47) LF's actions have now foreclosed all avenues of administrative appeal and this matter is ripe for judicial review.

48) Because valid, objective, and well-supported medical and vocational evidence establishes that Mr. Felt is, and shall remain, totally disabled per the Group and Voluntary Life Policies, he is entitled to a total disability waiver of life premium/extended death benefit retroactive to 6/11/24 through 65.

**WHEREFORE**, based upon the preceding reasons, Plaintiff prays for the following relief:

A) That this Court enter judgment in Mr. Felt's favor against LF and order the immediate reinstatement of his WOLP/extended death benefit retroactive to 6/11/24 though age 65, the maximum benefit period.

B) That this Court order LF to pay Mr. Felt prejudgment interest pursuant to *Horn v. McQueen*, 353 F. Supp. 2d 785 (2004) and post-judgment interest in accordance with M.C.L. § 600.6013 and 600.6455.

C) That this Court award attorneys' fees pursuant to 29 U.S.C. § 1132(g).

D) That Mr. Felt recovers all other relief to which he may be entitled, along with the costs of litigation.

Respectfully submitted:

**FELDHEIM & WILENKIN, P.C.**

By: s/Ilana S. Wilenkin
Ilana S. Wilenkin (P61710)
Plaintiff's attorney
30300 Northwestern Highway, Suite 108
Farmington Hills, MI 48334-3255
(248) 932-3505; fax (248) 932-1734
ilana@lawsmf.com

Dated: January 7, 2026